Jorge **GOMEZ**, et al.,
Plaintiffs-Appellants,

v.

**ILLINOIS STATE BOARD OF EDUCATION and Ted Sanders**, in his official capacity as Illinois State Superintendent of Education, Defendants-Appellees.

No. 85–2915.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1986.
Decided Jan. 30, 1987.

Norma V. Cantu, Mexican American Legal Defense and Ed. Fund. Inc., San Antonio, Tex., for plaintiffs-appellants.

Rosalyn B. Kaplan, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The primary question presented in this appeal is whether the district court erred in dismissing the plaintiffs' complaint on the ground that it failed to state a claim under § 204(f) of the Equal Educational Opportunities Act of 1974 (codified at 20 U.S.C. § 1703(f)), the Fourteenth Amendment, and Title VI of the Civil Rights Act of 1964. For the reasons stated below, we find that the lower court's dismissal of the complaint under Fed.R.Civ.P. 12(b)(6) was improper and will remand the action for further proceedings consistent with this opinion.

I

On April 16, 1985, the plaintiffs filed in federal district court an action under 42 U.S.C. § 1983 and Fed.R.Civ.P. 23(b)(2) in which they sought injunctive and declaratory relief on behalf of all Spanish-speaking children of limited English proficiency "who have been, are, or will be enrolled in Illinois public schools, and who have been, should have been, or should be assessed as limited English-proficient." Complaint ¶ 6. (In this opinion, children of limited English proficiency will be referred to as "LEP children.") The six named plaintiffs—students enrolled in either the Iroquois West School District No. 10 or the Peoria School District No. 150—are Spanish speaking. Five are LEP children. The sixth has not yet had her English proficiency tested by her local school system. The complaint named as defendants the Illinois State Board of Education ("Board") and the State Superintendent of Education, Ted Sanders ("Superintendent").

In passing on the propriety of the district court's ruling under Fed.R.Civ.P. 12(b)(6), we must accept the well-pleaded factual allegations of the complaint as true. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d

1101, 1104 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). We are, of course, not bound by the plaintiffs' legal characterization of the facts. *Prudential Life Insurance Co. v. Sipula,* 776 F.2d 157, 159 (7th Cir.1985). Thus, the following fact recitation is drawn from the complaint. In that pleading, the plaintiffs alleged the following:

In general terms, the plaintiffs were injured because the Board and the Superintendent violated both federal and state law by failing to promulgate uniform and consistent guidelines for the identification, placement, and training of LEP children. As a direct result of the defendants' acts or omissions, the plaintiffs have been deprived of an equal education and have suffered economic hardship, undue delays in their educational progress, and in many cases exclusion from any educational opportunities.

Under Ill.Rev.Stat., ch. 122, ¶ 1A–4(C), the Board is responsible for the educational policies and guidelines for public and private schools from pre-school through grade 12. Under *id.* ¶ 14C–3, that state agency must prescribe regulations for local school districts to follow in ascertaining the number of LEP children within a given school district and for classifying these children according to the language in which they possess primary speaking ability and according to their grade level, age, or achievement level. The Board must also prescribe an annual examination for determining the level of the LEP children's oral comprehension, speaking, reading, and writing of English. The Board has received and continues to receive federal funding for the implementation of educational programs designed to benefit LEP children.

The Superintendent is the chief executive officer of the Board. Under Illinois law, the Board has delegated to the Superintendent the authority to act on its behalf. The Superintendent has also been delegated the authority to develop rules necessary to "carry into efficient and uniform effect all laws for establishing and maintaining"

public schools in the state including, *inter alia,* "teaching and instruction, curriculum, library, operation, administration and supervision." State Board of Education, *The Illinois Program for Evaluation, Supervision, and Recognition of Schools* (Document No. 1) at i (1977). The Superintendent is specifically charged with establishing rules for the approval and reimbursement of local school districts that provide transitional bilingual educational programs. Ill. Rev.Stat., ch. 122, ¶ 14C–12.

The Board has promulgated regulations requiring every local school district in Illinois to identify LEP children. *Id.* ¶ 14C–1. The identification process is referred to as a "census." When a census at a particular school building identifies as LEP children 20 or more students who speak the same primary language, the local district is required to provide a transitional bilingual education program. *Id.* ¶ 14C–3. When the census discloses less than 20 such students, the Board does not conduct any review or supervision of the existence or adequacy of whatever services a district might provide to LEP children.

The plaintiffs allege that the Board and the Superintendent have failed to provide local districts with adequate, objective, and uniform guidelines for identifying LEP children. As a result, local districts perceive that they have unlimited discretion in selecting methods of identifying such children and as a result have been able to avoid transitional bilingual education requirements by identifying less than 20 LEP children of the same primary language in a particular building. In addition, because of the absence of proper guidelines, local districts have been found to use as many as 23 different language proficiency tests, 11 standardized English tests, 7 standardized reading tests, and many formal and informal teacher-developed tests. Some of these tests do not accurately measure language proficiency, so that LEP children are not properly identified. This array of tests has also, to the detriment of the plaintiffs, resulted in inconsistent results.

As a result of the defendants' failure to prescribe the proper guidelines, LEP children throughout the state have been denied the appropriate educational services they are entitled to under federal and state law. Until the proper guidelines are promulgated, the local districts will continue to deny the plaintiffs such services. The Board and the Superintendent have failed, and continue to fail, to support and enforce the statutory and regulatory requirements against those local districts that are not complying with the existing requirements. In addition, the defendants have also failed to withhold federal and state funds from the non-complying districts. They have, in violation of federal law, failed to provide equal educational opportunities to those students in attendance centers with less than 20 LEP children with the same primary language. The Board and the Superintendent have identified, as of March of 1984, 38,364 Spanish-speaking LEP children. Only 33,179 are in transitional bilingual educational programs. Thus, 5,185 students identified as LEP children are being denied adequate educational programs and equal educational opportunities.

According to the complaint, the defendants' actions of failing to provide loc~l districts with proper guidelines for the identification and placement of LEP children and of failing to monitor and enforce the local districts' compliance with the law, violate the plaintiffs' rights under (1) § 204(f) of the Equal Educational Opportunities Act of 1974 ("EEOA"), codified at 20 U.S.C. § 1703(f); (2) the Equal Protection Clause of the Fourteenth Amendment; and (3) Title VI of the Civil Rights Act of 1964 (codified as amended at 42 U.S.C. § 2000d et seq.) and its regulations, 34 C.F.R. § 100.3 *et seq.*

The plaintiffs, after alleging that they had no adequate remedy at law, sought declaratory and injunctive relief, as well as costs and attorney's fees under 42 U.S.C. § 1988. They requested that the class be certified, but the record before us does not indicate that the district court ever ruled on certification.[1] The defendants did not answer the complaint, but filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted.

The district court granted the defendants' motion on July 12, 1985. 614 F.Supp.

---

1. Following oral argument and preparation of the draft opinion in this case, the court decided *Glidden v. Chromalloy American Corp.,* 808 F.2d 621 (7th Cir.1986). In *Glidden,* the court held that, under certain circumstances, the lack of a decision on the class certification question deprives a district court's judgment of the requisite finality for appealability under 28 U.S.C. § 1291 (thus depriving this court of jurisdiction over the appeal). However, *Glidden* does not require us to similarly hold that the judgment here appealed from was not final, because the unusual circumstances involved in that case are not present in this case. In *Glidden,* the district court deliberately withheld decision on the certification motion pending appeal of its grant of summary judgment for the defendants and contemplated further proceedings to determine the motion. 808 F.2d at 623. In the words of this court:

The case is not over in the district court. The court has not identified the parties to be bound by the judgment, one of the elementary requirements of finality. The opinion granting summary judgment explicitly contemplates further proceedings to ascertain who shall be bound.... We are confronted with the possibility of two appeals: one on the merits, followed by a second appeal if either party should be dissatisfied with any aspect of the certification of the class (or the refusal to certify a class). A final decision is one wrapping up the case and leaving nothing but execution, ... this "judgment" does not meet that test.

*Id.* at 623.

In the present case, the district court did not retain anything for later decision. While the court's failure to decide the certification question would have presented problems if we had affirmed and the defendants later sought to plead the judgment as *res judicata* to a subsequent suit brought by other members of the putative class (and for this reason we caution the district courts against disposing of putative class actions without deciding whether a class should be certified), resolution of those problems would have to await a subsequent suit, rather than additional proceedings in the present one. The district court dismissed the suit in its entirety, clearly leaving itself with nothing else to decide. While the failure to decide the certification question may have been error, it was not such as to deprive this court of jurisdiction over this appeal.

342. Citing *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the lower court held that the Eleventh Amendment barred any relief the plaintiffs sought for violations of Illinois law. It did not pass on the Eleventh Amendment questions regarding violations of federal law, however, but concluded that the defendants had discharged any obligations imposed on them by the EEOA. Specifically, the district court ruled that no particular remedy is set forth in the EEOA for implementing bilingual education, so that a state is free to establish its own program and to delegate to local school districts the primary burden of implementing it. According to the lower court, once a state has passed a statute setting up a transitional bilingual education program and once the state's board of education has drawn up and promulgated guidelines for the program's implementation, the burden of execution shifts to the local districts, and the state agencies have no further obligations.

The court concluded that the Board and the Superintendent had issued "detailed" regulations, so that the defendants had no further duty under Illinois or federal law. Accordingly, any remedy available to the plaintiffs must come from the local districts. The court went on, however, to conclude that the state defendants "are not the proper parties ... under § 1703(f)." 614 F.Supp. at 347. The court, therefore, dismissed the plaintiffs' complaint and directed them to file a new complaint under § 1703(f) against the local school officials in the federal district court in which the districts are located.

The court then turned to a consideration of the remaining claims under both the Equal Protection Clause and Title VI. It concluded that, because "the plaintiffs allege neither purposeful discrimination nor past de jure discrimination in the defendants' attempts to enact transitional bilingual education programs," the allegations

of violations of the Equal Protection Clause, § 1983, and Title VI did not state a claim. 614 F.Supp. at 347. The complaint was dismissed in its entirety, and the plaintiffs' motion for reconsideration was denied. This appeal followed.

## II

### A. Preliminary Matters

Before discussing the merits of the district court's dismissal of the complaint, we must consider two preliminary matters: the effect of the Eleventh Amendment on the plaintiffs' claims for relief and the nature of 12(b)(6) procedures.

#### 1. Eleventh Amendment

The significance of the Eleventh Amendment "lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Article III" of the Constitution.[2] *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Thus, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court held that the amendment barred a citizen from bringing suit against his own state in federal court, even though the express terms of that constitutional provision did not so provide. This fundamental limitation on federal jurisdiction applies (subject to certain exceptions discussed below) not only when the plaintiff seeks to recover under federal law, *see Papasan v. Allain,* — U.S. —, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), but also when he seeks to vindicate a right having its genesis in state law, *see Pennhurst,* 465 U.S. at 117, 104 S.Ct. at 917.

The instant case presents several questions relating to the Eleventh Amendment. One was addressed by the lower court. The others were not, presumably because

---

**2.** The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

of the manner in which that court ruled on the 12(b)(6) motion and because of the defendants' sketchy presentation of these issues below. Nonetheless, because the Eleventh Amendment defense "partakes of the nature of a jurisdictional bar," *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974), we will consider its applicability in the instant case, even though the district court did not. *See id.; see also Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (Eleventh Amendment defense considered even though not raised in district court); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 466–67, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945) (Eleventh Amendment defense considered even though raised for first time in Supreme Court).

### a. State Law Violations

■ The defendants maintain that the interpretation of the Eleventh Amendment set forth in the Supreme Court's recent decision in *Pennhurst, supra,* bars the plaintiffs' action. We, however, must affirm the district court's conclusion that *Pennhurst* does not foreclose this lawsuit, for the simple reason that the plaintiffs are not seeking to vindicate rights based on state law. They alleged only that the defendants failed to discharge the duties imposed by *federal* law under the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and § 204(f) of the EEOA. As we understand the complaint, the plaintiffs have no quarrel with Illinois's Transitional Bilingual Education Act. Thus, the plaintiffs' position is not that they could hold the defendants liable under Illinois law, but rather that they have been injured by the defendants' failure to implement that state enactment to the extent required by *federal* law. *Pennhurst,* therefore, is not controlling.

### b. Federal Law Violations

The district court did not expressly analyze the effect Illinois's immunity would have on any of the plaintiffs' federal claims. Nonetheless, because, as noted above, the Eleventh Amendment sets forth a jurisdictional limitation, we will consider the scope of that state's immunity to the extent possible on the record before us.

■ As a general matter, states and their agencies cannot be sued in federal court unless they consent to suit in unequivocal terms or unless Congress, pursuant to a valid exercise of power (as, for example, when it enacts legislation pursuant to its enforcement authority under § 5 of the Fourteenth Amendment), unequivocally expresses its intent to abrogate that immunity. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985); *Gary A. v. New Trier High School District No. 203,* 796 F.2d 940, 943 (7th Cir.1986). According to the Supreme Court's decision in *Atascadero,* 105 S.Ct. at 3147, "A general authorization for suit in federal court is not the kind of statutory language sufficient to abrogate the Eleventh Amendment." The Court has never held, however, that a statute must expressly provide that it abrogates the states' immunity, and we note that such a requirement would be inconsistent with the Court's Eleventh Amendment jurisprudence. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Thus, although a federal enactment must "unequivocally" abrogate immunity, it may do so, not in so many words, but rather by its effect. For example, an abrogation may be found where any other reading of the statute in question would render nugatory the express terms of the provision. *Cf. Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (implied repeal); *Milwaukee County v. Donovan,* 771 F.2d 983, 986 (7th Cir.1985) (Congress has general intent to avoid results that would vitiate purpose of specific legislative provisions, so statute will not be interpreted so as to defeat goals of legislative scheme), *cert. denied,* —— U.S. ——, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986). We turn now to an examination of the defendants' possible Eleventh Amendment defense to the plaintiffs' claims under

§ 204(f) of the EEOA and Title VI of the Civil Rights Act of 1964.[3]

### i. Equal Educational Opportunities Act

■ With reference to the EEOA, we agree with the Ninth Circuit's conclusion in *Los Angeles Branch NAACP v. Los Angeles Unified School,* 714 F.2d 946 (9th Cir. 1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984), that Congress abrogated the states' Eleventh Amendment immunity to the extent necessary to effectuate the purposes of the Act. It should be noted that any other interpretation would render that enactment a dead letter *ab initio.*

There can be no dispute that the EEOA was passed pursuant to the enforcement authority of § 5 of the Fourteenth Amendment. *See* 20 U.S.C. §§ 1701, 1702; *see also Castaneda v. Pickard,* 648 F.2d 989, 1008 n. 9 (5th Cir.1981). A consideration of the relevant provisions of Title 20 of the United States Code only serves to confirm our conclusions concerning the Act's abrogation of sovereign immunity. Section 204(f) of the EEOA, codified at 20 U.S.C. § 1703(f), provides:

> No *State* shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
> (f) the failure by an *educational agency* to take *appropriate action* to overcome language barriers that impede equal participation by its students in its instructional programs.

(emphasis added). Sections 221(a) and (b) of the EEOA, codified at 20 U.S.C. §§ 1720(a) and (b), provide:

> (a) The term "educational agency" means a local educational agency or a "State educational agency" as defined by [20 U.S.C. § 3381(k)].
> (b) The term "local educational agency" means a local educational agency as defined by [20 U.S.C. § 3381(f)].

(emphasis added). Under 20 U.S.C. § 3381(k), a "State educational agency" is defined as:

> [T]he *State* board of education or other agency or officer primarily responsible for the *State* supervision of public elementary and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law.

(emphasis added). Under 20 U.S.C. § 3381(f), a "local educational agency" is defined as follows:

> [A] public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. Such term also includes any other public institution or agency having administrative control and direction of a public elementary or secondary school.

Finally, 20 U.S.C. § 1706 provides that "an individual denied an equal educational opportunity ... may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate."

■ Although § 1706 does not expressly refer to the states, it is clear from the language set forth above that the obligations of § 1703(f) are imposed on the states and their agencies. Thus, any action under § 1706 to enforce § 1703(f) can only be maintained against entities that would ordinarily be immune under the Eleventh Amendment (unless, of course, the plaintiffs seek a remedy on the local level only). Stated in another manner, the definition of "educational agency" includes both state and local agencies and, without the abroga-

---

**3.** Because we find that the plaintiffs' Fourteenth Amendment claim must be dismissed due to the absence of allegations regarding discriminatory intent, *see* § II(D) of this opinion, we need not consider the effect of the Eleventh Amendment on that claim.

tion of sovereign immunity, state agencies would, in practice, vanish from that definition.

Unlike, for example, 29 U.S.C. §§ 794 and 794a, 20 U.S.C. §§ 1703(f) and 1706 do not simply provide relief against a general class of defendants that may or may not include the states and their agencies. *See Atascadero*, 105 S.Ct. at 3147–49 (29 U.S.C. § 794a, which allows for suit against "any recipient of federal assistance," too general to constitute congressional abrogation of Eleventh Amendment immunity). Nor are these enactments similar to 42 U.S.C. § 1983, which provides for suit only against a state officer, not against the state itself. *See Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (§ 1983 not intended to limit sovereign immunity); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (same). To the contrary, the EEOA expressly contemplates that relief is to be obtained from the state and its agencies. *Cf. Gary A.*, 796 F.2d at 944 n. 6. It is for these reasons, then, that we conclude that Congress intended to abrogate the states' Eleventh Amendment immunity to the extent such immunity would foreclose recovery under that act.

ii.  Title VI of the Civil Rights Act of 1964

Our research has produced no decision that directly addresses the question whether Congress abrogated the states' Eleventh Amendment immunity with the passage of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000d to 2000d–4. However, the Supreme Court's construction in *Atascadero* of similar language in 29 U.S.C. §§ 794 and 794a provides an answer to the effect of Title VI on the Eleventh Amendment. The language for 29 U.S.C. § 794 was modeled after 42 U.S.C. § 2000d. *See Timms v. Metropolitan School District*, 722 F.2d 1310, 1318 n. 4 (7th Cir.1983); *Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84, 107–08 n. 29 (3d Cir.1979). If 29 U.S.C. § 794 was found to be insufficient in *Atascadero* to abrogate the states' Eleventh Amendment protection, then it follows that the

substantially similar language of 42 U.S.C. § 2000d is also insufficient. *Cf. Gary A.*, 796 F.2d at 944 (interpretation of 29 U.S.C. § 794 in *Atascadero* compels conclusion that similar language in the Education for All Handicapped Children Act of 1975, codified at 20 U.S.C. §§ 1400–1420, does not abrogate sovereign immunity).

■ Apart from the similarity in the language of § 794 and § 2000d, we find that there can be no abrogation under § 2000d because, in contrast to 29 U.S.C. § 794a, any right of action the plaintiffs may have under Title VI is an implied one. *See Guardians Association v. Civil Service Commission*, 463 U.S. 582, 593–97, 103 S.Ct. 3221, 3227–30, 77 L.Ed.2d 866 (1983). It is well settled that, when considering an "implied" right of action, we must be chary in our interpretation of the statute that confers such a right, lest we provide for a more comprehensive set of remedies than Congress intended. *Community & Economic Development Ass'n v. Suburban Cook County Area Agency on Aging*, 770 F.2d 662 (7th Cir.1985). In the context of the Eleventh Amendment, it is difficult to understand how we can conclude that Congress unequivocally abrogated the states' immunity defense when the legislature did not even provide an express right of action for private parties and when the class of potential defendants described in the statute is a general one that may or may not include states and their agencies. That the language of the regulations promulgated under Title VI (*see* 34 C.F.R. § 100 (1985)) may be broader than the associated statutory language does not alter the result: although an administrative agency may give an expansive reading to the remedial sections of a particular statutory scheme, it is Congress alone, not the agency, that has the power under § 5 of the Fourteenth Amendment initially to abrogate the states' sovereign immunity.

We, however, note that Illinois may have waived its immunity for the purposes of Title VI. As the Court stated in *Atascadero*, 105 S.Ct. at 3145 n. 1, "A State may

effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program." The exiguous state of the record before us—and absence of any argument from either side on the question—precludes any decision from us on waiver. That issue then must be pursued below on remand.

Of course, our discussion regarding abrogation and waiver of immunity under Title VI applies only to the Board. It would appear initially that the Superintendent might be held accountable for the appropriate declaratory and injunctive relief under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny. However, the record does not disclose the nature of the relief the plaintiffs would seek under § 2000d, so a decision from this court now on the scope of the relief that might be available from this state official would be premature. As with the waiver question, the parties must take up the issues relating to the *Young* doctrine on remand.

### 2. Rule 12(b)(6)

In view of what transpired below, we will pause to review the function of Rule 12(b)(6) procedures and the scope of the record a court must consider in passing on a motion under that rule. If the Federal Rules of Civil Procedure required that every action filed in district court proceed to trial, the costs generated thereby would be enormous and there would be little benefit in the way of increased accuracy in the results. For many lawsuits, it is obvious well before trial that the defending party is entitled to judgment and that there is no need to expend further the resources of the parties and the court. Thus, the federal rules employ several filters for separating out those suits that should receive plenary consideration from those that should not. Rule 12(b) contains the first set of filters. By moving under subsection (6) of that rule, the defending party maintains that, accepting the plaintiff's allegations as true, the complaint fails to state a claim upon which relief can be granted. At this point in the proceedings, where the plaintiff is a master of his pleading, there is no need to continue the suit if the party initiating the action cannot unilaterally set forth the necessary allegations that entitle him to recovery; thus, judgment should be for the defending party. This is not a decision for the district court to make lightly, however, as the dismissal of the suit under 12(b)(6) could preclude another suit based on any theory that the plaintiff might have advanced on the basis of the facts giving rise to the first action. *American Nurses' Association v. State of Illinois*, 783 F.2d 716, 726–27 (7th Cir.1986).

Thus, in ruling on the 12(b)(6) motion, a district court must accept the well-pleaded allegations of the complaint as true. In addition, the court must view those allegations in the light most favorable to the plaintiff. *Car Carriers*, 745 F.2d at 1106. Similarly, the record under 12(b)(6) is limited to the language of the complaint and to those matters of which the court may take judicial notice. The complaint cannot be amended by the briefs filed by the plaintiff in opposition to a motion to dismiss. *Id.* at 1107. By the same token, the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations. The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence.

It has been said that the complaint should be dismissed only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations set forth in that pleading. *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, this formulation has not been taken literally, *Car Carriers*, 745 F.2d at 1106, because it would permit the dismissal of only patently frivolous cases.

*See American Nurses' Association,* 783 F.2d at 727. Nonetheless, although the articulation of the standard may vary, it is undisputed that the defendant must overcome a high barrier to prevail under Rule 12(b)(6).

The problem in the instant case is that, from our reading of the district court's decision dismissing the complaint, it appears that the court neither accepted the plaintiffs' allegations as true nor viewed the evidence in the light most favorable to the plaintiffs. For example, the court did not directly address the plaintiffs' assertion that, although the Board and the Superintendent had ostensibly issued regulations for the education of LEP children, those measures were ineffective in identifying and placing these students.

■ We also note that the plaintiffs, after the initial dismissal of the complaint, filed a motion for reconsideration to which they attached affidavits, including a rather lengthy one from F. Howard Nelson, an "independent research consultant and program evaluator." In that document, Mr. Nelson discussed the inadequacies of the Illinois educational system for LEP children. Affidavits, however, are the weapons of summary judgment, not of challenges to the sufficiency of the complaint. *See* Fed.R.Civ.P. 12(b), 12(c), 56. It is understandable that the plaintiffs would attempt to make such a showing given the court's reliance on factual inferences not present in the pleadings. Nonetheless, once the district court dismissed the complaint, the plaintiffs had either to amend the complaint or to appeal the judgment.[4] *Cf. Car Carriers,* 745 F.2d at 1111. Attaching affidavits to the motion for reconsideration of the dismissal of the complaint is not appropriate, unless the district court

converts the 12(b)(6) motion into one for summary judgment. That conversion was not accomplished below and, of course, cannot be done here because it would be unduly prejudicial to the parties in view of the paucity of this record.

### B. Review of Dismissal of Complaint

#### 1. Equal Educational Opportunities Act of 1974

The relevant provisions of the EEOA are set forth in § II(A)(2)(a) of this opinion and will not be repeated herein. The EEOA was a floor amendment to the 1974 legislation amending the Elementary and Secondary Education Act of 1965. *See* Pub.L. No. 93–380, 93d Cong., 2d Sess., tit. II, 88 Stat. 484, 514 (codified in scattered sections of 20 U.S.C.). There is virtually no legislative history on the provision, and we agree with the observation of the Fifth Circuit in *Castaneda v. Pickard,* 648 F.2d 989, 1001 (5th Cir.1981), that in interpreting floor amendments unaccompanied by illuminating debate a court must adhere closely to the ordinary meaning of the amendment's language.

Congress has provided us with little guidance for the interpretation of § 1703(f). The term "appropriate action" used in that provision indicates that the federal legislature did not mandate a specific program for language instruction, but rather conferred substantial latitude on state and local educational authorities in choosing their programs to meet the obligations imposed by federal law. But, as noted in *Castaneda,* 648 F.2d at 1009, "Congress also must have intended to insure that schools made a genuine and good faith effort, consistent with local circumstances and resources, to remedy the lan-

---

4. Of course, if the complaint alone had been dismissed, so that the litigation was not terminated, then the dismissal would not be a final appealable order. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1111 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). However, the district court in the instant case clearly dismissed the claims against the defendants with prejudice, because it found that the defendants had discharged their obligations under state and federal law and that they were not the "proper parties." Thus, the litigation initiated with this complaint had been terminated. The district court's observation regarding actions against local districts simply meant that the plaintiffs were invited to initiate a series of suits against a new set of defendants in other federal district courts, not that the initial action would continue in other federal fora.

guage deficiencies of their students and deliberately placed on federal courts the difficult responsibility of determining whether that obligation had been met." In addition, it is clear that § 1703(f) places the obligation on *both* state and local educational agencies to provide equal educational opportunities to their students.

We are, of course, not unmindful of an important institutional limitation that is present even in the absence of the broad language of § 1703(f). Because of the nature of the judicial process, federal courts are poorly equipped to set substantive standards for institutions whose control is properly reserved to other branches and levels of government better able to assess and apply the knowledge of professionals in a given field (here elementary and secondary education). In such a situation, we must formulate legal rules that protect the plaintiffs' interests in obtaining equal educational opportunities (through the elimination of language barriers) and that give guidance to educational agencies in establishing programs to promote those interests. At the same time, we must be careful not to substitute our suppositions for the expert knowledge of educators or our judgment for the educational and political decisions reserved to the state and local agencies. *See Castaneda,* 648 F.2d at 1009.

It is for these reasons that we believe we should review a state's implementation of § 1703(f) in a manner similar to that which we employ in reviewing an administrative agency's interpretation and implementation of its legislative mandate. *See, e.g., Bowen v. American Hospital Association,* — U.S. ——, 106 S.Ct. 2101, 2122–23, 90 L.Ed.2d 584 (1986); *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 41–44, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983). Although Congress has provided in § 1703(f) that the spectrum of permissible choice for educational agencies would be broad, that does not mean that the spectrum is without discernible boundaries. This is not a case in which there are no substantive rules to apply, so that there is "neither legal right nor legal

wrong." *Achacoso-Sanchez v. INS,* 779 F.2d 1260, 1265 (7th Cir.1985). The term "appropriate action" is not simply precatory, but must be given content with a mind to the EEOA's allocation of responsibilities between the courts and the schools. The duty remains upon us to interpret and enforce congressional enactments, and we cannot accord such sweeping deference to state and local agencies that judicial review becomes in practice judicial abdication.

We find that, as a general matter, the framework set out in *Castaneda,* 648 F.2d at 1009, provides the proper accommodation of the competing concerns identified above. *See also United States v. Texas,* 680 F.2d 356, 371 (5th Cir.1982). Of course, we do not mean to say that we are adopting without qualification the jurisprudence developed in the Fifth Circuit regarding the interpretation of the EEOA. However, the *Castaneda* decision provides a fruitful starting point for our analysis. The fine tuning must await future cases. We, for example, may find that the *Castaneda* guidelines, when applied to a broad range of cases, provide for either too much or too little judicial review. In the instant case, however, they give the proper initial direction for the inquiry.

■ First, we must examine carefully the evidence of record regarding the soundness of the educational theory or principles upon which the challenged program is based. The court's responsibility in this regard is to ascertain whether a school system is pursuing a program informed by an educational theory recognized as sound by experts in the field or at least considered a legitimate experimental strategy. *Castaneda,* 648 F.2d at 1009. Our function is not to resolve disputes among the competing bodies of expert educational opinion. So long as the chosen theory is sound, we must defer to the judgment of the educational agencies in adopting that theory, even though other theories may also seem appropriate.

Second, we must determine whether the programs actually used by a school system

are reasonably calculated to implement effectively the educational theory adopted by the system. After providing substantial leeway for the school system to choose initially its program, we would not be assuring that "appropriate action" was being taken if we found that the school system, after adopting an acceptable theory of instruction, failed to provide the procedures, resources, and personnel necessary to apply that theory in the classroom. *Id.* To the contrary, practical effect must be given to the pedagogical method adopted.

Finally, we must decide whether a school's program, although ostensibly premised on a legitimate educational theory and adequately implemented initially, fails, after a period of time sufficient to give the plan a legitimate trial, to obtain results that would indicate that the language barriers confronting the students are actually being overcome. *Id.* at 1010. In other words, the program can pass the first two thresholds of *Castaneda,* yet may after a time no longer constitute appropriate action for the school system in question, either because the theory upon which it was based did not ultimately provide the desired results or because the authorities failed to adapt the program to the demands that arose in its application. Judicial deference to the school system is unwarranted if over a certain period the system has failed to make substantial progress in correcting the language deficiencies of its students.

■ The defendants maintain that the *Castaneda* decision applies only to local school districts. We disagree. There is certainly no language in that case to suggest that it is so limited. Indeed, the Fifth Circuit in a subsequent decision applied the *Castaneda* guidelines to an entire state school system. *See Texas,* 680 F.2d at 371–72. There will be, of course, differences in the application of the *Castaneda* analysis depending on whether a state or a local program is at issue. The question is primarily one of the intensity of judicial review. For example, the state school board and its superintendent are obviously not directly involved in the classroom edu-

cation process. Thus, state educational agencies can only set general guidelines in establishing and assuring the implementation of the state's programs. That does not mean, however, that they have no obligations under the EEOA, for even those general measures must constitute "appropriate action." If a local district is involved, however, then a consideration of what actually occurs in the classroom might be appropriate.

In this case, the first step of the *Castaneda* analysis, *i.e.,* whether the program at issue is based on sound educational theory, is not implicated, because the plaintiffs have no quarrel with the basic "transitional bilingual" education program the state of Illinois has chosen for LEP children. The plaintiffs do maintain, however, that the defendants have failed to meet the second step of *Castaneda,* which relates to implementation. Obviously, then, if the defendants have failed to satisfy step two, we need not consider step three, because this final step assumes that there has been an adequate initial implementation of the program.

That brings us to the central issue of this dispute: What obligation does § 1703(f) impose on state (as opposed to local) educational agencies for the implementation of programs designed to provide LEP children with an equal educational opportunity? Accepting (as we must) the plaintiffs' allegations as true, the district court's decision means that the defendants need only issue regulations that fail to provide local districts with adequate and uniform guidelines for identifying and placing LEP children in a transitional bilingual education program and that the defendants need not monitor and enforce the implementation of the program chosen by the state's legislature.

■ We cannot accept such an interpretation of the EEOA. Section 1703(f) could hardly be called detailed, but it does make clear, through the definition of the term "educational agency," that the obligation to take "appropriate action" falls on both state and local educational agencies. We concur in the conclusion of the Ninth Cir-

cuit in *Idaho Migrant Council v. Board of Education*, 647 F.2d 69 (9th Cir.1981), that § 1703(f) requires that state, as well as local, educational agencies ensure that the needs of LEP children are met. The plaintiffs in essence alleged that the defendants have only gone through the motions of solving the problem of language barriers. Although the meaning of "appropriate action" may not be immediately apparent without reference to the facts of the individual case, it must mean something more than "no action." State agencies cannot, in the guise of deferring to local conditions, completely delegate in practice their obligations under the EEOA; otherwise, the term "educational agency" no longer includes those at the state level. Exactly what state educational agencies must do beyond establishing the minimums for the implementation of language remediation programs and enforcing those minimums is not at issue in the instant appeal, because the plaintiffs have done no more than allege that the defendants failed even to establish the minimums needed for identifying and placing LEP children. These allegations, nonetheless, are enough to withstand a 12(b)(6) challenge. Whether the plaintiffs can prove their case is a matter that must be determined on remand, not on appeal. We can only decide at this early stage of the litigation that the plaintiffs have stated a claim and, therefore, that the dismissal of the complaint was improper.[5]

The defendants concede that they are required under Illinois law to issue regulations for the identification and placement

of LEP children, but argue that they are not empowered to supervise and enforce the local school districts' compliance with those regulations. It is clear, however, that the Board and the Superintendent are vested with the authority under state law to supervise the local districts and to enforce state regulations. *See, e.g.,* Ill.Rev. Stat. ch. 122, ¶¶ 2-3, 2-3.3, 2-3.6, 2-3.8, 2-3.25, 2-3.26, 2-3.39, 2-3.48, 14C-1 to 3, 14C-12; *see also Lenard v. Board of Education*, 74 Ill.2d 260, 24 Ill.Dec. 163, 167, 384 N.E.2d 1321, 1325 (1979). At oral argument, counsel for the defendants conceded that the Board and the Superintendent had the power to mandate that local districts provide the proper education for LEP children. We, of course, would be confronted with a very different set of questions if a state did not grant its educational agencies the power to implement state programs even though § 1703(f) required that those agencies take appropriate action to provide equal educational opportunities to their students. That is not, however, the case before us.

We must address two events that occurred after the district court rendered its decision in the instant case. First, we noted above that the plaintiffs in their complaint addressed the defendants' alleged failure to supervise, monitor, and enforce Illinois's transitional bilingual education legislation in those local districts required by state law to establish such programs and that the plaintiffs also complained of the lack of programs for those attendance centers with less than 20 LEP children. When this suit was filed, Ill.Rev.Stat. ch.

---

5. Our holding that the Board may properly be sued for violations of the EEOA is in no way inconsistent with *Board of Education of Peoria v. Illinois State Board of Education*, 810 F.2d 707 (7th Cir.1987), where we held that, under the Illinois State law as incorporated by Fed.R.Civ.P. 17(b), the Board lacked capacity to sue a local school board under 42 U.S.C. §§ 1981 and 1983. We note that capacity to sue and capacity to be sued are not necessarily coterminous. For example, many states have provisions which deprive foreign corporations of the capacity to sue unless they first qualify to do business within the state, yet do not prevent such corporations from defending any action which is brought against

them. *See, e.g.,* Ill.Rev.Stat. ch. 32, ¶ 13.70 (Smith-Hurd Supp.1986). In *Peoria Board of Education,* we specifically noted that:

> We do *not* hold that the State Board or any other governmental entity is unaccountable when it contributes to a violation of the constitution or laws of the United States simply because its role in the overall state activity is a limited one.

810 F.2d at 713 (emphasis in original).

We adhere to the above quoted statement and hold that the State Board may be sued for any violation of the EEOA which it may have committed.

122, ¶ 14C–3 provided that "[a] school district *may* establish a program in transitional bilingual education with respect to any classification with less than 20 children therein" (emphasis added). The Illinois legislature added the following language on August 1, 1985 (to become effective on that date):

> but should a school district decide not to establish such a program, the school district *shall* provide a locally determined transitional program of instruction which, based upon an individual student language assessment, provides content area instruction in a language other than English to the extent necessary to ensure that each student can benefit from educational instruction and achieve an early and effective transition into the regular school curriculum.

(emphasis added). We reject the defendants' contention that this new legislation moots the plaintiffs' claim relating to those attendance centers with less than 20 LEP children. If anything, this new provision places an additional obligation (along with the general ones imposed by Ill.Rev.Stat. ch. 122, ¶ 2) on the defendants to ensure that students in these attendance centers are receiving a proper education. Indeed, the defendants in their brief to this court have informed us that they will be developing regulations for the implementation of these local programs mandated by the 1985 amendment. We cannot, of course, determine on the record before us the effect this new legislation will have on the actions of the defendants, but we can say that the plaintiffs' claims are not now moot.

That brings us to the second development. On April 4, 1986, the Board released proposed regulations for the implementation of Illinois's Transitional Bilingual Education Act that, if adopted, would replace those in effect when this suit was filed. However, at the time of our decision, these remain only *proposed* regulations. We do not understand then the de-

fendants' argument that this administrative proposal in April of 1986 provides the plaintiffs with the relief they seek. Not only have the proposed regulations not been adopted, but they have never been tested in practice. The defendants could issue administrative pronouncements that, although (in the district court's words) "detailed," have no practical value whatsoever. That the defendants have reconsidered the regulations about which the plaintiffs complain does not mean that the defendants have eliminated the alleged deficiencies in the education of LEP children. On remand, the district court will, of course, consider any new provisions the defendants may promulgate. In any event, a decision from us on this record about the proposed regulations would be premature.

To summarize, we hold that the plaintiffs' allegations relating to § 1703(f) state a claim upon which relief can be granted. The district court's dismissal of the complaint was, therefore, improper and is reversed.

### 2. Remaining Claims

As the district court noted in its decision, the plaintiffs sought to recover under the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000d to 2000d–4.[6] The court correctly concluded that, because the plaintiffs did not allege that the defendants acted with a discriminatory intent, the Fourteenth Amendment claim and Title VI statutory claim must fail. *See Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

The plaintiffs, however, also sought to recover under the *regulations* promulgated pursuant to Title VI. *See, e.g.,* 34 C.F.R. § 100.3. Although the vot-

---

6. 42 U.S.C. § 2000d provides:
   No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

ing of the Justices may be difficult for the reader to discern at first, a majority of the Court in *Guardians Association* concluded that a discriminatory-impact claim could be maintained under those regulations, although not under the statute. *See* 463 U.S. at 607 n. 27, 103 S.Ct. at 3235 n. 27 (White, J.); *id.* at 608 n. 1, 103 S.Ct. at 3235 n. 1 (Powell, J., concurring in the judgment); *see also Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985); *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 630 n. 9, 104 S.Ct. 1248, 1252 n. 9, 79 L.Ed.2d 568 (1984); *Castaneda v. Pickard*, 781 F.2d 456, 465 n. 11 (5th Cir.1986). Although *Guardians Association* was an employment discrimination case, there is nothing in that decision to indicate that the Court's interpretation of the regulations implementing Title VI was limited to employment decisions. In addition, the regulations are broadly drafted and contain no limiting language. *See Georgia State Conference v. State of Georgia*, 775 F.2d 1403, 1417 n. 19 (11th Cir.1985). Thus, we hold that the portion of the plaintiffs' Title VI claim based on the implementing regulations survives the defendants' 12(b)(6) challenge, even though there was no allegation in the complaint that the defendants acted with a discriminatory intent.

### III

For the reasons stated above, the district court's dismissal of the complaint is AFFIRMED in part and REVERSED in part and the action is REMANDED for further proceedings consistent with this opinion.