Steven HUGHES, Plaintiff–Appellant,

v.

JOLIET CORRECTIONAL CENTER, Dr. Stanley Harper, and Jeannie Koehler, Defendants–Appellees.

No. 89–1629.

United States Court of Appeals, Seventh Circuit.

Argued March 5, 1991.

Decided April 18, 1991.

Suzanne Isaacson, Jeffrey R. Tone, Sidley & Austin, Roslyn C. Lieb, Chicago Lawyers' Committee, Chicago, Ill., for plaintiff-appellant.

Deborah L. Ahlstrand, Asst. Atty. Gen., Office of Atty. Gen., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal concerns the outer bounds of the Eighth Amendment's prohibition against cruel and unusual punishments, the use of summary judgment, and the standards for requesting counsel to

assist indigents in civil cases. The plaintiff, Steven Hughes, is an inmate in an Illinois state prison. The defendants are the prison, and a doctor and a nurse on the prison's staff. The prison is insulated from suit by the Eleventh Amendment, *Santiago v. Lane*, 894 F.2d 218, 220 n. 3 (7th Cir. 1990), so was properly dismissed. The judge, after refusing to request counsel to assist Hughes, dismissed the other two defendants—and the case—on the ground that the complaint failed to state a claim. Fed.R.Civ.P. 12(b)(6).

The complaint narrates a tale of serious medical malpractice. Maybe worse—maybe a tale of that "deliberate indifference to serious medical needs of prisoners" that turns a malpractice case into a case of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir.1990) (per curiam). On February 22, 1985, Hughes was transferred to the Joliet Correctional Center to begin serving an eight-year term. Upon being received at the Center he complained to a doctor about weakness in both legs as a result of a gunshot wound for which he had been hospitalized for two months and which had injured his spine. He was on crutches. The doctor gave him some pain medication. The next day, Hughes was unable to get out of bed. When on the following morning, a Sunday, nurse Koehler, one of the defendants, walked by Hughes' cell, he complained to her that he could not walk to the chow hall because his back hurt when he tried to stand up, that his legs were very weak, and that he had to see a doctor. The nurse told him he would have to wait till Monday because there was no doctor on duty at the Joliet Correctional Center on Sunday. Later that day Hughes repeated his complaints to a guard and asked to take his meals in his cell, as he had been permitted to do the previous day. The guard checked with nurse Koehler who told him that nothing was wrong with Hughes and that he could go and get his own food—so he simply skipped his meals on Sunday. That evening, while attempting to switch on the light in the ceiling of his cell—which could be done only by screwing the light bulb into the socket—Hughes fell off his bed. A guard came by, and Hughes told her he could not move. Hughes was then taken to the prison hospital and given pain medication.

It was not until 1:30 the following afternoon that Hughes, in the prison hospital, was X-rayed; and it was not until the day following that that he was seen, for the first time since entering Joliet, by a doctor—defendant Harper. "Dr. Harper said he had never seen an X-ray of me before and said that he could see where my vertebrae had been tore out and that some bullet fragments were still around my spine; however, he stated that he saw no new damage. He also stated that he was not a spine or back specialist, but he did say that he wanted to see me walking soon." This was on Tuesday. The next day Harper told Hughes "that he thought I could walk but was not sure. I told Dr. Harper that the pain medication was not helping me and he stated that he was not going to give me anything else for my pain, and that he thought I was full of bullshit." A week later, Hughes, who was still in the prison hospital, told Harper that he had no feeling in his legs and could not move them. He asked for a wheelchair and also to see a specialist in spinal injuries. Dr. Harper's response was to order Hughes transferred to the psychiatric ward, where nurse Koehler removed Hughes's crutches and leg brace because psychiatric patients are not permitted to have such things. Also (as alleged in a subsequent pleading), Harper ordered Hughes's bed moved away from the toilet, so that he would have to walk to the toilet in order to use it. On April 4, Hughes was finally examined by a neurologist, who told him he will never walk again.

■ These are the facts alleged in the plaintiff's pleadings. They may well be exaggerated, even false, in material respects. But for purposes of deciding whether the complaint fails to state a claim, we must assume that they are true.

If Harper and Koehler were merely careless in their diagnosis and treatment of Hughes—being honestly convinced that he was a malingerer, as the medical reports in Hughes's file (of which more shortly) state—then Hughes clearly is in the wrong court. He should be pursuing a malpractice action in an Illinois state court. If on the other hand Harper and Koehler were trying to cripple Hughes, then, equally clearly, they are guilty of inflicting cruel and unusual punishment, for which federal law gives Hughes a remedy. We do not understand Hughes to be charging so extreme a form of misconduct. But we do think he is charging a form of misconduct that, while less egregious, is actionable under the cruel and unusual punishments clause. The facts suggest that these two defendants—particularly Dr. Harper—were treating Hughes not as a patient, but as a nuisance; that they were not only careless of his welfare, but indifferent to it; that although they doubtless underestimated the severity of his injury, at the same time they were insufficiently interested in his health to take even minimum steps to guard against the possibility that the injury was severe. Such words and deeds as telling Hughes he was full of bullshit, shifting him to the psychiatric ward where he would not be allowed to have his crutches and leg brace, and ordering the bed moved away from the toilet so that Hughes would have to get up and walk to it (without the aid of crutches, since he was still in the psychiatric ward) suggest more than mere neglect—suggest hostility, brutality, even viciousness. And this in dealing with a man who had entered the prison on crutches just days before, after two months in the hospital recovering from a spinal injury. The facts alleged are not as raw as those alleged in *Williams v. Vincent*, 508 F.2d 541 (2d Cir.1974), where (according to the complaint) the plaintiff's ear had been cut off by another inmate and the prison doctor told the plaintiff "he did not need his ear," threw away the severed portion in front of the plaintiff, and then sewed up the stump. But they are raw enough to defeat a motion to dismiss for failure to state a claim. Rather similar

allegations were held to state a claim in both *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir.1980), and *Mullen v. Smith*, 738 F.2d 317, 319 (8th Cir.1984) (per curiam). See also *Wood v. Sunn*, 865 F.2d 982, 985, 989–90 (9th Cir.1988).

The case is complicated, however, by the fact that the defendants not only moved to dismiss the complaint for failure to state a claim but also moved in the alternative for summary judgment, attaching to this motion some of Hughes's prison medical records—and in response Hughes submitted the rest of those records. The district judge did not mention the motion for summary judgment but the defendants argue that we can and should affirm the dismissal of the suit because they were entitled to summary judgment. The medical records are admissible in evidence and therefore appropriately considered in a summary judgment proceeding. Fed.R. Evid. 803(4), (6); *Cook v. Hoppin*, 783 F.2d 684, 689–90 (7th Cir.1986). They show that the defendants did give Hughes more or less continuous medical attention, of sorts; that they identified Hughes as a malingerer; and that while by April 4 he was indeed paraplegic, before then, when he was in the prison hospital, he had greater mobility than he was letting on—hence supplying some basis for the charge of malingering. Since the medical records are the only evidence in the case, and since once evidence is submitted in a summary judgment proceeding the nonmovant cannot rest on his pleadings but must produce his own evidence (and so Hughes was warned, pursuant to *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982)), it is tempting to conclude that the medical records negate the existence of a genuine issue of material fact. They do not contradict all the allegations of the complaint, but by establishing (in the absence of contrary evidence—and there is no contrary *evidence*, just allegations in the complaint and in Hughes' opposition to the motion to dismiss) that the defendants were convinced that Hughes was a malingerer, they greatly undermine an inference of deliberate indifference. If the defendants honestly thought that Hughes

had no spinal injury and was capable of walking without crutches, then their behavior, while crass and unprofessional, would not amount to the deliberate or even reckless infliction of punishment and so would not be actionable under the Constitution. Cf. *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985).

◼ But we do not think it necessary to decide whether the record as we have it would justify summary judgment for the defendants. For we think the judge gave insufficient consideration to Hughes's motion that she appoint a lawyer to assist him in developing that record. Technically this was a motion that she request—not appoint—a lawyer, because in a civil case involving an indigent party who desires representation the court's power is limited to requesting a lawyer to represent that party. 28 U.S.C. § 1915(d); *Mallard v. United States District Court,* 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989); *DiAngelo v. Illinois Dept. of Public Health,* 891 F.2d 1260, 1262 (7th Cir.1989). Nevertheless judges are usually able to find lawyers willing to accede to such "requests," which as a practical matter therefore are appointments, and we shall use the familiar terminology.

◼ The district judge denied Hughes's motion because her policy is not to appoint counsel for an indigent prisoner until and unless she decides that an evidentiary hearing is warranted. This may well be a sound policy in general, because a layman's need for a lawyer is most acute when a case reaches the stage at which evidence must be obtained and presented. But this suit *had* reached that stage when the defendants moved for summary judgment, since by submitting evidence with their motion the defendants shifted to the plaintiff the burden of producing his own evidence. Clearly what was needed was an affidavit from the plaintiff attesting to, and therefore presenting as evidence, the key allegations of the complaint, insofar as he still believed them to be true and was willing to swear to this. Instead of submitting such an affidavit, the plaintiff, noticing that the defendants had not submitted all his medical records, completed the medical file, as it were, by submitting those records which the defendants had omitted.

◼ We do not for a moment suggest that a district judge should appoint counsel whenever the defendant in a prisoner or other indigent civil case submits evidentiary materials with the motion for summary judgment. If those evidentiary materials simply deny the key allegations of the complaint, then alerted by the warning required by *Lewis v. Faulkner* the plaintiff knows that to ward off dismissal he must produce his own evidence. But the defendants' materials in the present case were more oblique. They did not meet the principal allegations of the complaint head on but instead set forth facts that if true indicated that the plaintiff had failed to meet the high burden of proving cruel and unusual punishment in the form of medical neglect. It is not surprising that the plaintiff did not recognize the medical records as a potential death blow to his case, especially since they confirmed many of the details of his complaint—including the ultimate diagnosis of paraplegia. In deciding whether to grant a motion for appointment of counsel, a district judge must be alert to the pitfalls that confront laymen in dealing with nonintuitive procedural requirements applied in a setting of complex legal doctrine. Hughes had a colorable case, but without the assistance of a lawyer was likely to be tripped up by his opponents' lawyers. Cf. *Lewis v. Lane,* 816 F.2d 1165, 1170–71 (7th Cir.1987).

One could of course question the necessity of courts' ever *providing* counsel to indigent plaintiffs in cases that if meritorious promise a substantial recovery of damages. Such cases should be attractive to tort lawyers, who can be hired on a contingent-fee basis by an indigent plaintiff. Why should government intervene, even to the limited extent of merely "requesting" a private lawyer to take on the case for free, if the market can be relied on to supply legal services to those indigents whose legal rights have actually been violated? If Hughes has been crippled for life as a result of the defendants' deliberate indif-

ference to his medical needs, he should be able to obtain a substantial award of damages with which to compensate a privately retained lawyer; and perhaps from his failure to have retained a lawyer we should infer that his case probably is not as strong as it looks on the basis of the incomplete record to date. *Merritt v. Faulkner*, 697 F.2d 761, 769 (7th Cir.1983) (concurring and dissenting opinion). On the other hand, maybe it is unrealistic to attribute to prisoner Hughes sufficient sophistication to have realized that he ought to make efforts to retain a lawyer on his own, rather than simply ask the district judge to do it for him. We need not resolve the question, as our quarrel with the district judge is that she should have considered Hughes's request in light of the particulars of his case rather than simply deny the request in accordance with a general policy. We conclude that his suit was dismissed prematurely.

The judgment is affirmed insofar as it dismisses Joliet Correctional Center, but is otherwise vacated, and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.