Thomas **BLACKBURN** and Raymond T. **Green**, Plaintiffs,

v.

Charles **SWEENEY**, Jr., and Daniel **Pfeifer**, Defendants.

Civ. No. 4:93cv0050AS.

United States District Court, N.D. Indiana, Hammond Division, at Lafayette.

March 31, 1994.

Philip A. Whisler and James S. Fanzini, Indianapolis, IN, for plaintiffs.

Ronald E. Elberger, George E. Purdy, Indianapolis, IN, Robert J. Konopa and Ann–Carol Simons, South Bend, IN, for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On or about July 15, 1993, the plaintiffs, Thomas Blackburn and Raymond T. Green, filed this complaint invoking this court's federal question jurisdiction under Title 15 U.S.C. § 1, commonly known as the Sherman Antitrust Act. The plaintiffs are lawyers, as are the defendants, Charles Sweeney Jr. and Daniel H. Pfeifer, and once upon a time, they were all in the same law firm with offices in South Bend, Indiana, Fort Wayne, Indiana, and elsewhere, which engaged extensively in television advertising focused principally on the solicitation of personal injury litigation.

On or about October 6, 1993, the defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Later, on February 24, 1994, the defendants filed a further motion to dismiss, or, in the alternative, for summary judgment, invoking both Rules 12(b)(6) and 56, Fed.R.Civ.P. The record in this case, while sounding in the high level concepts of antitrust law, has all of the earmarks of a domestic relations dispute, since it involves the break-up of a small, tightly-compact law firm and the professional and personal relationships that inhere therein.

One of the principal responses by the plaintiffs to the dispositive motions filed by the defendants is to launch major discovery warfare, in which neither of these parties are wearing secular halos. It is somewhat amusing that a part of this discovery dispute involves an argument about where.

This court has very serious reservations as to the need for any further discovery in this case to deal with these pending motions. However, in the interest of the greatest caution, *all* of these parties, namely, Thomas Blackburn, Raymond T. Green, Charles Sweeney, Jr. and Daniel Pfeifer, are now **ORDERED** to appear personally in Fort Wayne, Indiana, before the Honorable Roger B. Cosbey, United States Magistrate Judge, and *all* disputed discovery materials are to be presented to Magistrate Judge Cosbey in camera, so that he can determine and file a Report and Recommendation as to what further discovery is relevant to the issues in this case as framed by the pending motions. It is the expressed desire of this court that such proceeding go forward as soon as possible. This court expects these lawyer parties to fully comply with this Order and will accept nothing less than same. This court will use its full authority to see that both the letter and the spirit of this Order is fully complied with. **IT IS SO ORDERED.**

This record literally reeks with revenge, retaliation and retribution. To be sure these four lawyers, with the advice of other lawyers, negotiated vigorously and extensively

to agree upon a final version of a written agreement with reference to the mutual withdrawal from partnerships. After elaborate and extensive negotiations, a final version was agreed upon and signed. *See* Appendix "A". This record is absolutely silent as to any improper coercion applied to these plaintiffs before they signed this agreement. The ink was hardly dry on this highly relevant written document until these plaintiffs were attempting to undermine it on the basis of federal antitrust law. The question to be answered in this case is whether there is a possible basis for them to do so under the so-called rule of reason. More on that later.

This court has read with some considerable interest the massive discovery that has already taken place in this case, and realizes that especially in the area of economic proof, there are a vast number of details that might arguably be relevant. This court has read and examined the elaborate paper chase in this case, and the conduct of some counsel in some of the deposition transcripts stops just short of being oppressive harassment. There appears to be a propensity on the part of some simply to want to prolong the process and make it as agonizing for the adversary as possible.

Because of what has already happened in this case, this court intends to run a very tight rein on any further discovery and it is for that reason, among others, that these four lawyer parties, as well as their counsel, will appear at one time and personally before United States Magistrate Judge Roger B. Cosbey, who will take a very firm hand in dealing with any further discovery in this case.

This court now takes up both the motions to dismiss filed by the defendants on October 6, 1993, and the motion to dismiss and in the alternative, for summary judgment, filed on February 24, 1994.

When this apparently lucrative lawyer partnership broke up, a written agreement was entered into which was attached to the original complaint, and is now attached as Appendix "A" to this Memorandum and Order. After having signed this agreement, these plaintiffs now contend that it violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

By moving under Fed.R.Civ.P. 12(b)(6) for dismissal, the defendant asserts that even assuming the plaintiff's allegations are true, the complaint fails to state a claim upon which relief can be granted. This rule contains only one of several "filters" used by the courts to separate "those suits that should receive plenary consideration from those that should not." *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987). The rule's capacity to save the parties' and the court's resources is obvious.

However, this court must be especially careful when faced with a motion for dismissal. The court should accord the plaintiff's complaint a reasonably tolerant reading, because

the dismissal of the suit under 12(b)(6) could preclude another suit based on any theory that the plaintiff might have advanced on the basis of the facts giving rise to the first action.

*Id.* (citing, *American Nurses' Association v. State of Illinois*, 783 F.2d 716, 726–27 (7th Cir.1986)). *See also, Wright v. Bosch Trucking Co.*, 804 F.Supp. 1069, 1071 (C.D.Ill. 1992); *Stewart v. RCA Corp.*, 790 F.2d 624, 632 (7th Cir.1986). As stated by the *Stewart* court, a complaint "almost barren of facts" may comprise claims of a specific category if read liberally. *Stewart*, 790 F.2d at 632.

Dismissal of a complaint is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). *See also, Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992). This court must accept the well-pleaded factual allegations of the complaint as true and "construe such allegations in favor of the plaintiff." *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1416 (7th Cir.1992). As a point of clarification, the court notes that it is required to accept only factual allegations; "it is not required to accept legal conclusions that may be alleged or that may be drawn from the pleaded facts." *Milwaukee v.*

*Saxbe*, 546 F.2d 693, 704 (7th Cir.1976); *see also, Reichenberger v. Pritchard*, 660 F.2d 280, 282 (1981).

To escape dismissal "[a] plaintiff need not set out in detail the facts upon which a claim is based, but must allege sufficient facts to outline the cause of action." *Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (citations omitted). "The complaint cannot be amended by the briefs filed by the plaintiff in opposition to a motion to dismiss." *Gomez*, 811 F.2d at 1039.

Likewise, the defendant may not "attempt to refute the complaint or to present a different set of allegations" in its 12(b)(6) challenge. *Id.* The defendant's attack must be against the sufficiency of the complaint; it "must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence." *Id.*

Where a motion to dismiss is filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and materials outside the motion to dismiss are presented to and not excluded by the court, then the motion to dismiss may be treated as a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. *See, First Interstate Bank, N.A. v. Chapman & Cutler*, 837 F.2d 775, 776–777 (7th Cir.1988); *Cange & Stotler and Co., Inc.*, 826 F.2d 581, 583 (7th Cir.1987); and *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987). Thus, where a party moves for dismissal upon the pleadings alone, it will be considered a Rule 12(b)(6) motion for dismissal. However, where a party files a Rule 12(b)(6) motion for dismissal and the court relies on materials outside the pleadings, it will be considered a Rule 56 motion for summary judgment.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) [1]; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990).

During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment mo-

1. For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

tions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–2514.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1992).

At the outset of his administration, the number one item on President Woodrow Wilson's agenda was the Clayton Act, now found at 15 U.S.C. 15. Section 4 of that Act provides as follows:

> Any person who shall be injured in his business by reason of anything forbidden in the antitrust laws may sue therefor in the district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the costs of suit including a reasonable attorney's fee.

To be sure the 62nd Congress painted with a very broad legislative brush in what was considered to be remedial and reform legislation. However, the Supreme Court has not read the statute so generously. For example, in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), holding that the injury involved in an antitrust case should reflect the anti-competitive effect either of the violations or of the anti-competitive acts made possible by the violation. There are serious causation problems of both kind and quality involved. More than a mere injury in fact is required. *See Associate General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

One of the areas in which attempts are made by private individuals to invoke the blessings of § 4 of the Clayton Act involves staff physicians in disputes with hospitals about their staff privileges. An illustrative case in point is found in *Robles v. Humana Hospital Cartersville,* 785 F.Supp. 989 (N.D.Ga.1992). *Robles* does not make it easy for plaintiffs in this regard, and the magic words seem to be wound up in the concept of "antitrust injury." *See also Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984).

■ The centerpiece of this agreement that is here disputed appears to relate to agreed restrictions on advertising in three described television marketing areas, namely, South Bend, Fort Wayne and Lafayette, Indiana. It needs to be emphasized that this agreement does not forbid any of the parties from engaging in the practice of law in South Bend, Indiana or any place where such is authorized. It only relates to an agreement with regard to advertising.

The parties in this case and their counsel would do well to revisit the landmark case decided by Judge Learned Hand a long time ago in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945), dealing with relevant market. *See also Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422 (5th Cir.1981). This court can know judicially and from this record that in the entirety of the Northern District of Indiana, consisting approximately of the north third of the State of Indiana, drawing an east-west line through Lafayette, Indiana, and dealing with the territory in Indiana north of that line, there is widespread competition for plaintiffs' personal injury litigation involving lawyers and law who advertise on television, other electronic media, and by elaborate Yellow Page advertisements, as well as roadside billboard advertisements. This court can and does take note of the number of pages given over to that kind of advertisements in the telephone directories which cover a large part of the territory of this district. There is a substantial television market emanating from within Indiana in South Bend, Elkhart, Fort Wayne, and Lafayette.

The plaintiffs here assert that paragraphs seven, nine and eleven are an agreement to allocate markets among horizontal competi-

tors, and as such is subject to the *per se* rule rather than the rule of reason, as found in *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). A facial examination of this agreement on its face fails to disclose any price fixing agreement among horizontal competitors. It takes an extremely large jump in logic, as well as in law, to conclude from the agreed restrictions on advertisements to an agreement to allocate market territory. That is the heart of the dispute in this case. These provisions fall far short of the requirements of *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *See also Consultants and Designers v. Butler Service Group*, 720 F.2d 1553 (11th Cir.1983).

As strange as it might seem to someone who would have dropped on this planet recently, the phenomenon of television advertising lawyers is a relatively new one, made possible by a generous reading of the First Amendment of the Constitution of the United States by the Supreme Court in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). *See also Shapero v. Kentucky Bar Assn.*, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988). Although certainly lawyers such as Abraham Lincoln placed small ads in local newspapers in a day before mass media and mass markets, television advertising and indeed elaborate Yellow Page advertising is not the only way, nor even the primary way, by which most personal injury lawyers acquire clients. Traditionally, it was on the basis of such esoteric things as professional competence and reputation. But we live in a new world, and those of us who have lived long in the profession must understand the dynamic of change, and in the fashion of Henry Adams in his *Education of Henry Adams*, we have to understand that the society in which we live is not static. Neither is the legal profession, nor the means by which lawyers acquire clients.

Specifically, there is absolutely nothing in this agreement to prohibit any of the lawyers who are parties in this case from appearing in any state or federal court in which they are entitled to practice anywhere in the United States of America. Just because able and experienced plaintiffs' counsel calls this a market allocation agreement, invoking the *per se* rule of § 1 of the Sherman Act, 15 U.S.C. § 1, does not make it so. *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), does not enure to the benefit of these plaintiffs.

This court has no difficulty whatsoever in holding that this agreement with reference to advertising restrictions is not a so-called *per se* agreement. *See* the reasoning and result in *Abadir*. That to this court is a fairly easy decision.

The more difficult decision has to do with whether this record examined under Rule 12(b)(6) or 56, Fed.R.Civ.P. would permit a trial on the merits under the rule of reason. *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *Abadir, supra*.

This court is all too aware of *Doe v. St. Joseph Hospital*, 788 F.2d 411 (7th Cir.1986), since it fell the task of this Judge to try this case on remand and notes that the plaintiff was unsuccessful in a trial before a jury, and that result was affirmed on appeal.

In examining the rule of reason claims, this court has been directed to the deposition of both plaintiff lawyers, which alone throws very serious doubts as to whether even under a generous reading of the rule of reason these two plaintiff lawyers can succeed at all.

The plaintiffs have also engaged in a frontal assault by filing their own motion for summary judgment on March 25, 1994. Their opening shot is that this agreement between competing advertising personal injury lawyers not to advertise in certain areas is *per se* illegal, and support the argument that such is an allocation of territories in order to minimize competition, creating *per se* illegality. Easy to say. The cases cited are light years away from this factual setting. *Compare Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990), and *United States v. Topco Assoc. Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

With all due deference, this court is very familiar and has read with historic interest *United States v. Gasoline Retailers Assoc.*

Inc., 285 F.2d 688 (7th Cir.1961), and the situation here is vastly different. This case does *not* involve in any way the advertising or restrictions of advertising on *prices*, since *prices* are not in any way the subject of the advertisements here involved. With all deference to the plaintiffs, the circumstances in this case do not even closely relate to those in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). *Goldfarb* is authority on the scope of the Commerce Clause here; it most certainly is not about bar association fee schedules and their enforcement.

The doctrine of ancillary restraint referred to by the plaintiffs in their March 25, 1994, brief is a most difficult concept. *See Polk Bros. Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir.1985). But the real problem is to find whether it has anything to do with this case. There is something of a tacit admission by the plaintiffs that even if the ancillary restraint doctrine is not applicable to the *per se* claims but under a rule of reason analysis, there might still be a basis for the plaintiffs to recover, *citing Sound Ship Building Corp. v. Bethlehem Steel Corp.*, 387 F.Supp. 252 (Dist.N.J.1975), *aff'd*, 533 F.2d 96 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

The Contract Clause in Article I of the Constitution of the United States has gone through much judicial recycling since *Dartmouth College v. Woodard*, 4 Wheaton 518, 4 L.Ed. 629 (1819), and the liberty of contract theory found in *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), has likewise been through the judicial shredder; however, there still remains perhaps, a very narrow slice of economic privacy by which persons, which includes lawyers, can engage in arms-length contractual agreements that do not fall afoul of either the Sherman or the Clayton Act.

This limited and narrow arrangement with regard to advertising just may fall within that narrow legal path through or around the thrust of the Sherman and Clayton Acts.

■■ This court is totally confident that this case is not a *per se* violation case. This court is somewhat less confident in this proceeding under Rule 12(b)(6) and Rule 56 (Fed.R.Civ.P.), as to whether it is possible for these plaintiffs to make out a rule of reason case. One of the principal hang-ups of this court is the concept of relevant market so well defined 50 years ago by Judge Learned Hand in *United States v. Aluminum Co. of America*. It may well be that when the concept of relevant market is carefully dissected, *all* of these lawyers are truly bit players in the relevant market, in spite of all of their advertising efforts. Notwithstanding the enormous problems, possibly insurmountable, that these plaintiffs must solve in presenting a rule of reason claim here, this court is constrained to let the case go forward, let the relevant discovery take place, permit the parties to again address the rule of reason issue under Rule 56, Fed. R.Civ.P., and then to proceed on to trial, if necessary.

In 1990, the Congress of the United States enacted the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471–482. Literally hundreds, if not thousands, of hours involving judges, lawyers and academics are involved in adopting a so-called plan, the focus of which was to expedite the trial and disposition of civil cases at a minimal cost. It has never been the view of this Judge that the principal villain in the cost of litigation is at the doorstep to the federal judiciary. It is rather at the doorsteps of litigants and the legal profession. Nonetheless, this court did what it was required to do, and continues to have an ongoing concern in regard to the cost as well as to the promptness of disposition of civil cases.

This case is going to be enormously costly and time-consuming to the parties and counsel. It may well drain time as well as fiscal resources to the breaking point for all concerned. Since these parties are lawyers, they, along with their respective counsel, all of whom are experienced and talented litigators, should be prepared to meet with Magistrate Judge Robin D. Pierce, in order to engage in in-depth, extensive settlement negotiations. This court should also state that its dividing certain functions between two of the magistrate judges in this district is quite intentional. It is the intent to have these parties and their counsel deal with Magis-

trate Judge Roger B. Cosbey, in regard to the discovery problems in the case, and to deal with Magistrate Judge Pierce in regard to settlement discussions, and to keep those two functions separate with two separate magistrate judges.

This court· now **GRANTS** summary judgment and dismissal as to all of the plaintiffs' claims under the so-called *per se* doctrine. The motions to dismiss and for summary judgment as to the rule of reason claims are now **DENIED** with leave to renew the same after discovery has been completed. It is the hope, sans a settlement, that the discovery process will be completed at an early time, since this case can be set for trial possibly as early as August this year in Lafayette, Indiana.

■ To the extent that these parties and counsel are quibbling over the existence or non-existence of interstate commerce, they should save their voices and paper. There can be no doubt that both the Sherman Act and the Clayton Act are based on the commerce authority of Congress in Article I of the Constitution of the United States. There also is no doubt that the Commerce Clause has been given a generous interpretation from the time of Chief Justice Marshall's opinion in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). There was a brief glitch in that ongoing process in *United States v. E.C. Knight,* 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895), but that was only a brief detour from an ongoing and expansive view of interstate commerce. For example, see *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), and *Kassel v. Consolidated Freightways Corp. Delaware,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). So, given the present expansive view of the commerce power, there is absolutely no question that these defendant lawyers are engaged in interstate commerce activities. So, it is not necessary for the plaintiffs to go through the client records of the defendants just to find out where these clients live. No further discovery of ̇that nature should be allowed by the magistrate judge.

If it is necessary for this case to go to trial on the rule of reason claims, it will be the intent of this court to bifurcate the issues of liability and try those issues first to verdict, and then and only if the plaintiffs prevail will the trier of fact be submitted relevant evidence on the issue of damages. If the only reason for requesting the income tax information from the defendants is on these damage issues, such will be stayed until a determination of liability has been made.

All of which is now **ORDERED.**

## APPENDIX A

### AGREEMENT TO WITHDRAW FROM PARTNERSHIPS

This Agreement made this 3 day of September, 1992, between Charles A. Sweeney (hereinafter "Sweeney"), Daniel H. Pfeifer (hereinafter "Pfeifer"), Thomas D. Blackburn (hereinafter "Blackburn"), and Raymond T. Green (hereinafter "Green"), witness that:

WHEREAS, Sweeney, Pfeifer and Blackburn are partners in the South Bend, partnership of Sweeney, Pfeifer and Blackburn (hereinafter "SPB"), the Fort Wayne partnership of SPB and the Lafayette partnership of SPB, and;

WHEREAS, Green is a partner in the Fort Wayne and Lafayette partnerships of SPB, and;

WHEREAS, the parties to this Agreement wish to settle certain disputes among them, and to restructure the three (3) partnerships;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereby agree as follows:

1. Blackburn hereby withdraws from the South Bend partnership of SPB and shall have no further rights in its business affairs or decisions. Blackburn will forego any rights he may have to any buy-out under the existing partnership agreement or to an accounting under common law or the Indiana Uniform Partnership Act.

2. Sweeney and Pfeifer hereby withdraw from the Fort Wayne and Lafayette partnerships of SPB and shall have no further rights in its business affairs or decisions. They will forego any rights they may have to any buy-

out under the existing partnership agreement or to an accounting under common law or the Indiana Uniform Partnership Act.

3. The lawsuit between the parties to this Agreement, now pending in the Allen Superior Court, will be dismissed with prejudice, and a stipulation made of record indicating that the conduct, actions and complaints involved private partnership matters involving contractual partnership issues only. This settlement shall be kept confidential among the parties and no disclosure of the terms hereof shall be made.

4. Blackburn and Green shall, within thirty (30) days of the date of signing of this agreement, pay attorney fees to Robert J. Konopa in the amount of $10,888.95 and to Leonard Eilbacher in the amount of $3,690.50 for representing Sweeney and Pfeifer in the litigation referenced in paragraph 3 above and for their work in restructuring the partnership.

5. Blackburn and Green will pay $37,856.50 each to Sweeney and Pfeifer as their share of monies spent for advertising pursuant to the accounting already provided relating to the litigation referenced in paragraph 3. Payment shall be made no later than 12/31/92.

6. Blackburn and Green will pay any accounting fees for amending the 1990 and 1991 Fort Wayne partnership income tax returns, if they are amended. Blackburn and Green will indemnify Sweeney and Pfeifer for any penalties, interest, and additional taxes incurred, if any, for these amended returns.

7. Sweeney and Pfeifer shall not directly or indirectly, within the areas described on Exhibit "A" attached hereto, do any advertising, including but not limited to, television, radio, newspapers, billboards, direct mail or yellow pages. In consideration of the agreement contained in paragraph 2 herein, Blackburn and Green shall not directly or indirectly, within the areas described on Exhibit "B" attached hereto, do any advertising, including but not limited to, television, radio, newspapers, billboards, direct mail or yellow pages.

8. Sweeney and Pfeifer for their agreement not to advertise as set forth in paragraph 7 above will each be entitled to receive 25% of the net annual profits of the Fort Wayne and Lafayette offices through the remainder of 1992 as well as for an additional period of five (5) calendar years. The final payment shall be made on or before the closing of books on December 31, 1997. Sweeney and Pfeifer shall each receive on December 31, 1997, an amount equal to 25% of the then existing amounts transferred into the advance account from the professional account. Sweeney and Pfeifer shall have the right to receive monthly and annual income statements through December 31, 1997. Sweeney and Pfeifer shall have the right to an accounting of cases settled and monies disbursed during the period of January through April, 1998. The following information shall be provided, upon request:

Client Name, Insurer, Dates of offer, Dates of Acceptance, Amount of Settlement, Dates of Disbursement

9. The annual advertising budgets for television, radio and newspaper for the Fort Wayne and Lafayette offices for the years 1993–1997 shall not exceed:

| | | |
|---|---|---|
| Fort Wayne/Warsaw | - | $125,000 |
| Lafayette/Kokomo | - | $45,000 (TV) and $12,000 (Radio and other media) |

10. Blackburn and Green shall retain yellow page advertising in all TV coverage areas in the Fort Wayne and Lafayette markets that are currently in place i.e., all yellow pages in the TV coverage areas of such markets.

11. Blackburn and Green shall retain yellow page advertising currently in place in the Marion, Indiana/Grant County area even though it is partially outside of the Fort Wayne or Lafayette TV coverage areas.

12. Blackburn and Green shall retain the office located in Warsaw, Indiana, which is a part of the Fort Wayne partnership.

13. Sweeney and Pfeifer will receive an amount equal to their initial investment of approximately $8,000.00 each, in the building located at 3344 Mallard Cove Lane. Such amounts shall be due and payable on or before December 31, 1992. Sweeney and

Pfeifer will quitclaim their interest in said building to Blackburn and Green and their spouses, upon receipt of said payment.

14. Blackburn and Green will assume and hold harmless Sweeney and Pfeifer on the following indebtedness:

(a) The commercial line of credit at Summit Bank which has an approximate balance of $80,000.00.

(b) The mortgage on the Mallard Cove property at Valley Bank.

15. The Fort Wayne and Lafayette offices will be allowed to advertise in the ordinary course of business as SP5 at least until such time as the next edition of the yellow pages for the primary Lafayette and Fort Wayne areas are published. Such advertising shall be done in compliance with all ethical requirements set forth in the Code of Professional Responsibility for the State of Indiana.

16. There are no pending malpractice claims against Blackburn or Green and there are pending malpractice claims against Sweeney and Pfeifer. Each partnership shall maintain until December 31, 1997 professional liability insurance coverage on a claims made basis insuring each partnership and the individual partners in an amount not less than current coverage. Proof of coverage shall be provided to any party to this agreement upon request.

Sweeney and Pfeifer shall be liable for all costs and damages on their pending claims as well as any future claims naming them or the South Bend Partnership. They shall indemnify the other parties from and against any and all claims, expenses (including any deductible payments required by the professional liability policies) or damages of any nature, related to any such claim.

Blackburn and Green shall be liable for all costs and damages on any future claims naming them or the Fort Wayne or Lafayette Partnership. They shall indemnify the other parties from and against any and all claims, expenses (including any deductible payments required by the professional liability policies) or damages of any nature, related to any such claim.

17. All clients' files on pending matters have been transferred to the appropriate partnership. Blackburn will forego any interest in attorney fees to be received on the Saunders and Kunz cases, now pending. These cases will be handled by the South Bend office upon consent of the clients.

18. The financial books, records and accounts of the Fort Wayne and Lafayette partnerships of SPB shall be delivered to the office of the Fort Wayne partnership by September 4, 1992. All advertising files and personal checking account records shall be returned to Blackburn and neither Sweeney nor Pfeifer shall retain copies.

19. Except for a violation of paragraph 7, above any dispute arising from this agreement shall be resolved with the use of an arbitrator, to be agreed upon among the parties. If the parties are unable to agree to a single arbitrator, each side of the dispute shall chose one arbitrator and they shall choose a third whose decision shall be final. All arbitrators shall be affiliated with the American Arbitration Association or a similar organization. The parties to this agreement agree that a violation of paragraph 7 above would create immediate and irreparable harm with no adequate remedy at law. Accordingly, all parties shall retain the right to seek a Temporary Restraining Order and Permanent Injunction with damages and attorney fees for any violation of paragraph 7. The prevailing party to any action under this paragraph shall be entitled to payment of attorney fees and litigation expenses incurred.

20. All parties release, acquit and forever discharge the other parties for any and all claims, charges, rights, demands, costs, pecuniary loss, damage (direct or consequential) actions or causes of action arising before the date of this agreement and not set out above.

21. This agreement constitutes the entire agreement between the parties concerning the subject matter expressed herein and any other communications, whether written or verbal, shall not be binding.

22. This agreement may be signed in counterparts, all of which shall have the effect of being an original.

23. This agreement shall be governed by the laws of the State of Indiana.

24. This agreement shall be binding on any successors of any partnership, and where there are multiple parties incurring responsibilities in any paragraph herein those responsibilities shall be joint and several.

IN WITNESS WHEREOF, the parties have caused this agreement to be executed.

SOUTH BEND PARTNERSHIP OF SWEENEY, PFEIFER AND BLACKBURN

_____
Charles A. Sweeney, Partner

_____
Daniel H. Pfeifer, Partner

_____
Thomas D. Blackburn, Partner

FORT WAYNE PARTNERSHIP OF SWEENEY, PFEIFER AND BLACKBURN

_____
Charles A. Sweeney, Partner

_____
Daniel H. Pfeifer, Partner

_____
Thomas D. Blackburn, Partner

_____
Raymond T. Green, Partner

LAFAYETTE PARTNERSHIP OF SWEENEY, PFEIFER AND BLACKBURN

_____
Charles A. Sweeney, Partner

_____
Daniel H. Pfeifer, Partner

_____
Thomas D. Blackburn, Partner

_____
Raymond T. Green, Partner

_____
Charles A. Sweeney,
Individually

_____
Daniel H. Pfeifer,
Individually

_____
Thomas D. Blackburn,
Individually

_____
Raymond T. Green,
Individually

---

EXHIBIT A

The T.V. coverage area of Fort Wayne shall include the following counties:

Adams
Allen
Huntington
Jay
Kosciusko

*La Grange
*Miami
*Noble
Steuben
Wabash
Wells
Whitley
Grant

* Exception: Sweeney and Pfeifer may place yellow page advertising in LaGrange and Miami counties and in the city of Ligonier in Noble County

The T.V. coverage area of Lafayette shall include the following counties:

Benton
Boone
Carrol
Cass
Clinton
Fountain
Howard
*Miami
Montgomery
Tippecanoe
Warren
White

EXHIBIT B

The T.V. coverage area of South Bend shall include the following counties:

St. Joseph
Elkhart
Marshall
La Porte
Fulton
Starke
Porter