114 F.3d 1191
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Vernon R. McCARTY, Petitioner-Appellant,
v.
Percy H. PITZER,[1] Warden, Respondent-Appellee.
 No. 96-2301.
 United States Court of Appeals, Seventh Circuit.
 Submitted April 30, 1997.*
Decided April 30, 1997.
 
 Before FAIRCHILD, BAUER and COFFEY, Circuit Judges.
 
 ORDER
 
 1
 Vernon McCarty, a federal prisoner, petitioned pro se for a writ of habeas corpus, 28 U.S.C. § 2241, alleging that his custodian deliberately provided him inadequate medical care for various painful or life-threatening illnesses and so violated the Eighth Amendment's prohibition of cruel and unusual punishment. He requested release from custody to seek his own medical care. The district court dismissed the petition, and McCarty appeals. We construe McCarty's suit as stating a Bivens civil rights claim, and reverse and remand for further proceedings.
 
 I.
 
 2
 When McCarty pleaded guilty in January 1994 before a Michigan district court, he indicated that he suffered from a potentially lethal heart condition and had recently developed a painful inguinal (groin) hernia. He stated that a doctor retained by the local jail, Dr. Robert Gunnell, had recommended a "thallium stress test" to evaluate his heart's condition in light of his history of angina and myocardial infarction. He also has high blood pressure, a paraesophageal hernia that threatens to obstruct the blood supply to his stomach, and recurrent ulcer disease causing gastrointestinal bleeding. The district court stated that McCarty would receive medically necessary treatment while imprisoned, and that "if he is not given appropriate medical attention, he's going to be promptly released by the Court." (Jan. 31, 1994, Hearing Tr. at 11.)
 
 
 3
 To date, McCarty has primarily been incarcerated at the Federal Correctional Institution at Oxford, Wisconsin (FCI-Oxford), but has frequently been transferred for short periods to other facilities for treatment and to testify as a state's witness. McCarty's pleadings and exhibits describe his medical treatment in great detail; we summarize only the basic chronology. In June 1994, while still housed in the county jail, McCarty was taken to the hospital for an emergency blood transfusion after complaining for several days of weakness and dizziness. At some point, the drug Prilosec was prescribed to treat his bleeding ulcer. In September he was transferred to FCI-Oxford via the Metropolitan Correctional Center in Chicago (MCC). During the stopover at the MCC, a physician's assistant substituted the less expensive drug Zantac for Prilosec. Upon reaching FCI-Oxford, McCarty notified a physician's assistant there that Zantac had earlier proven to be ineffective, but was nonetheless again prescribed Zantac. A rectal exam indicated bleeding and evidence of internal hemorrhage, yet McCarty claims no follow-up work was done.
 
 
 4
 McCarty continued to complain of pain from his inguinal hernia, dizziness, and angina. In December 1994 he received a second emergency transfusion of four units of blood at a hospital outside the prison. The doctor there recommended resuming Prilosec, but Zantac was again substituted when McCarty was taken to the Federal Medical Center, a Bureau of Prisons facility in Rochester, Minnesota. McCarty's inguinal hernia was surgically repaired in February 1995, approximately thirteen months after he first complained of it to the Michigan district court.
 
 
 5
 McCarty returned to FCI-Oxford in March 1995, but at the end of the month was transferred to the Western District of Michigan to testify, where he was again given Prilosec. In late April he received a third emergency transfusion of blood. In May 1995 Dr. Gunnell wrote a letter on McCarty's behalf stating, "It is imperative that [McCarty] remain on the drug Prilosec to prevent additional bleeding in the future. His medical condition is considered stable at this time, but again, he has had at least three serious near death experiences from gastrointestinal bleeding while incarcerated." (McCarty Exh. V.) When he returned from Michigan to FCI-Oxford, it appears that McCarty was given Prilosec, but he claims his heart medication was removed without explanation, then restored approximately a year later.
 
 
 6
 Last year, on April 4, 1996, McCarty received a cardiac stress test, but not the more sophisticated thallium stress test that Dr. Gunnell had recommended in 1994. FCI-Oxford medical personnel again withdrew the Prilosec. Two weeks later, the Prilosec was restored in response to McCarty's declining hemoglobin count (a sign of internal blood loss), but only on a 90-day provisional basis.
 
 
 7
 McCarty complains of what he asserts is deliberate inattention to evaluating and treating his heart condition and paraesophageal hernia; the allegedly purposeful thirteen-month delay before his inguinal hernia was repaired; being treated by purportedly unqualified physician's assistants; and, most urgently, the repeated substitution of Zantac for Prilosec, allegedly a cost-saving measure (he says generic Zantac costs 5cents a pill, Prilosec $5) that led to the three episodes of potentially lethal internal bleeding and may lead to further incidents.
 
 
 8
 The district court rejected McCarty's constitutional claim, concluding that his complaints amounted to mere disagreement over the most effective treatment options. The court described the Zantac-Prilosec dispute as a question of whether McCarty should have "initially" received Prilosec. It also noted that he was regularly seen by FCI-Oxford medical personnel and had been provided outside care "as required." The court held that the undisputed facts failed to show that anyone at FCI-Oxford was deliberately indifferent to McCarty's medical needs.
 
 II.
 
 9
 We pause to consider McCarty's chosen vehicle for this claim, a petition for a writ of habeas corpus. A claim of inadequate medical treatment is usually brought as a civil rights suit for damages or injunctive relief, based on 42 U.S.C. § 1983 where the defendants are state actors or on a Bivens theory, see Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), where the defendants are federal employees. See, e.g., Carlson v. Green, 446 U.S. 14 (1980); Hughes v. Joliet Correctional Center, 931 F.2d 425 (7th Cir.1991). McCarty, proceeding pro se, styled his petition as a motion to vacate his sentence under 28 U.S.C. § 2241. He is emphatic that he wants a writ, not injunctive relief, and unlike many prisoner plaintiffs he seeks no money damages at all. Moreover, he has sued no one but the warden, as is appropriate in a petition for a writ of habeas corpus and rarely so for a civil rights suit. See Moore v. Pemberton, No. 96-3715, 1997 WL 134405, at * 2 (7th Cir. Mar. 24, 1997) (per curiam).
 
 
 10
 Notwithstanding McCarty's insistence, his choice of habeas corpus is mistaken. As this court's general distinction between prisoner civil rights and habeas corpus claims explains:
 
 
 11
 If the prisoner is seeking what can fairly be described as a quantum change in the level of custody--whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation, or the run of the prison in contrast to the approximation to solitary confinement that is disciplinary segregation--then habeas corpus is his remedy. But if he is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will usually be the case, the program or location or environment that he is challenging is more restrictive than the alternative that he seeks.
 
 
 12
 Graham v. Broglin, 922 F.2d 379, 381 (7th Cir.1991). McCarty's challenge to the quality of his medical care does not question the fact, duration, or degree of his confinement, but rather its conditions, and under Graham he must turn to a Bivens injunctive remedy. See Falcon v. United States Bureau of Prisons, 52 F.3d 137 (7th Cir.1995). That McCarty's petition literally "seeks" release or transfer to fix the problem does not change this result. Even if it turns out that a change in his level of confinement is needed as a remedy, that change will not alter the strictly conditions-of-confinement basis of his constitutional challenge.
 
 
 13
 McCarty's confusion should not subject him to dismissal. The pleadings of pro se plaintiffs are held to less stringent standards, and under appropriate circumstances the court may "convert" a mislabeled action. Estelle, 429 U.S. at 106; Graham, 922 F.2d at 381-82; see also Falcon, 52 F.3d at 138 (declining to reconstrue counseled petition). The Michigan district court that accepted McCarty's plea told him point blank that the remedy for improper medical care would be release from custody, connoting habeas corpus, and unlike Falcon neither the district court that entertained his writ nor the government noted his error.
 
 
 14
 We acknowledge that there are important distinctions between habeas corpus and civil rights suits that counsel against conversion where it may carry consequences unanticipated by the petitioner, as are described in Moore. Here, for example, McCarty's action does not allege the warden's personal involvement in depriving him of his rights, an unnecessary detail under habeas corpus but a fatal defect in a civil rights suit. In Copus v. Edgerton, 96 F.3d 1038 (7th Cir.1996), we instructed the district courts not to convert mislabeled civil rights actions to habeas corpus petitions at all. There do not appear to be pitfalls as grave in the reverse conversion, and, as in Moore, the present case is appropriately converted. On remand, McCarty should be given leave to amend his complaint to include the proper elements and defendants, or to move for voluntary dismissal if he does not wish to pursue the suit at all.
 
 III.
 
 15
 As McCarty recognizes, to state an Eighth Amendment claim founded on inadequate medical care he must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Negligence in diagnosis or treatment, if mere medical malpractice, does not state an Eighth Amendment claim. Id. at 106. To be "deliberately indifferent," a state of mind conceptually derived from criminal recklessness, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 114 S.Ct. 1970, 1979 (1994). It is not, however, necessary for the inmate to show that the official intended or was certain that harm would result. Haley v. Gross, 86 F.3d 630, 641 (7th Cir.1996). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 114 S.Ct. at 1981; see also Steele v. Choi, 82 F.3d 175, 178 (7th Cir.), cert. denied, 117 S.Ct. 244 (1996).
 
 
 16
 The warden maintains that McCarty's habeas corpus petition should have been dismissed for nonexhaustion of administrative remedies per Sanchez v. Miller, 792 F.2d 694, 697 (7th Cir.1986). The warden's argument and Sanchez concern a federal prisoner seeking habeas corpus relief, but a Bivens civil rights suit for injunctive relief must also satisfy the exhaustion rule, Pratt v. Hurley, 79 F.3d 601, 602 (7th Cir.1996). McCarty counters that exhaustion would be futile and in any event should not be judicially required, citing McCarthy v. Madigan, 503 U.S. 140 (1992). McCarthy does not help him on the latter point because it only excepts from exhaustion those claims for damages that the administrative system can not remedy; here, the grievance process is presumably capable of the type of corrective action that McCarty seeks, obviating judicial interference with the inner workings of the prison. See Pratt, 79 F.3d at 602-03.
 
 
 17
 The district court briefly noted the exhaustion argument but proceeded to the merits, evidently relying on the principle that nonexhaustion may be disregarded where a petition is most efficiently denied on the merits. Cf. 28 U.S.C. § 2254(b)(2). This factually undeveloped and important issue, including McCarty's claim of futility, is open to consideration on remand.
 
 
 18
 Regarding the substantive merits of McCarty's claim, it is clear that he has serious medical needs. The question is whether he has sufficiently alleged deliberate indifference, which as noted above requires that he show that the prison officials were actually aware of a substantial risk of serious harm and recklessly disregarded it. Although McCarty's allegations of indifference mostly rely on circumstantial evidence, we think for several reasons they are sufficient to avoid dismissal.
 
 
 19
 The district court falsely believed that McCarty's Zantac-Prilosec dispute was merely disagreement over which drug McCarty should have been given first, cf. Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-25 (7th Cir.1996). Instead, it is clear that what McCarty objects to is prison personnel repeatedly substituting Zantac for Prilosec. McCarty states that the difference between the two drugs is not "a case of wanting Bayer and getting Excedrin," but between treating and not treating his ulcer. At least one of his doctors, Dr. Gunnell, has insisted that McCarty be given this particular drug. The warden asserts that McCarty simply disagrees with the opinions of the professionals who have treated him, but really these professionals disagree with one another. The choice may be explained as a question of professional judgment or perhaps mere malpractice, but here the warden has conspicuously given no medical reason to dispute Dr. Gunnell's forceful recommendation of Prilosec.
 
 
 20
 The district court noted that McCarty has been seen and treated often, but the mere frequency of his visits with medical personnel and the administration of various treatments, though these were factors in rejecting the plaintiff's claim in Estelle, 429 U.S. at 107, do not of their own force prove that the prison officials were not deliberately indifferent. An Estelle claim may be proven by showing that medical personnel deliberately gave the plaintiff an ineffective treatment, even if they did it frequently, knowing it would not work. Kelley v. McGinnis, 899 F.2d 612, 617 (7th Cir.1990). A series of negligent acts may also at some point circumstantially demonstrate the required subjective awareness of serious risk, bearing in mind that negligence alone is not constitutionally actionable, Sellers v. Henman, 41 F.3d 1100, 1102-03 (7th Cir.1994). Moreover, several of McCarty's treatments were minor procedures such as wart removal or treatment of a painful elbow that do not count as attention towards his serious medical needs.
 
 
 21
 It is also disputed whether McCarty's inguinal hernia operation was deliberately delayed. The warden minimizes the operation as "elective," but McCarty claims that he was regularly doubled over in pain. The Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," regardless of "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." Estelle, 429 U.S. at 104-05 (citations and footnotes omitted). McCarty appears to have been vocal about his discomfort. Perhaps he wasn't really in serious pain, or perhaps there were good medical reasons to delay the operation given all of his other health problems. On the other hand, if McCarty's allegation of deliberate and wanton delay is true it throws into doubt the presumptive innocence of any other errors in his treatment.
 
 
 22
 Finally, it is unclear whether prison medical personnel have investigated McCarty's heart disease and paraesophageal hernia, despite the serious complications his outside doctors have asserted these conditions may cause. Although the warden hyperbolically asserts that "McCarty cannot show that any of these professionals did not make the best possible medical decisions for him," McCarty's allegations coupled with the inconsistencies of his medical record provide serious reason to doubt this claim. In sum, McCarty's allegations go beyond ordinary negligence and describe the sort of reckless misconduct needed to state an Eighth Amendment claim.
 
 
 23
 The judgment of the district court is REVERSED and REMANDED with instructions to grant McCarty leave to amend or dismiss his complaint.
 
 
 
 [1]
 Mr. Pitzer is hereby substituted for his predecessor, Mr. Hurley. Fed.R.App.P. 43(c)(1)
 
 
 *
 After an examination of the briefs and the record, we have concluded that oral argument is unnecessary; accordingly, the appeal is submitted on the briefs and the record. See Fed.R.App.P. 34(a); Cir.R. 34(f)